## UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| MICHAEL JORDAN, Russell Greene, Jason Lambro, Suzette Justice, Steve Justice, Marie-Pascale Ruberandinda. and John Douglas Burke, individually and on behalf of similarly situated individuals, <br><br> Plaintiffs, <br><br> v. <br><br> THE UNITED STATES OF AMERICA, <br><br> Defendant | ) ) ) ) ) ) ) ) ) ) ) <br><br> Civil Action No. **24-1028 C** |

## COMPLAINT

Plaintiffs Michael Jordan, Russell Greene, Jason Lambro, Robert Mills, Suzette Justice, Steven Justice, John Burke, and Marie-Pascale Ruberandinda ("Named Plaintiffs") individually and on behalf of similarly situated individuals ("Class Members" or "Collective Action Members"), by and through undersigned counsel, brings this action under the Fair Labor Standards Act ("FLSA"), 29 USC § 201 *et seq.* against Defendant, The United States ("Defendant"), for acts by US Agency for Global Media ("USAGM"), formally known as, Broadcasting Board of Governors (BBG), formerly the Voice of America ("VoA"); the Social Security Administration (SSA), Office of Hearings and Appeal (OHA); National Human Genome Research Institute (NHGRI) at the National Institute of Health (NHI); the U.S. State Department; and the U.S. Postal Service (USPS) (collectively "Defendant's Agencies").

## <u>NATURE OF THE ACTION</u>

1.      This class action arises from the above listed Agencies' willful misclassification of

1

Plaintiffs and the Class Members as independent contractors rather than employees. The Agencies wrongfully lured Plaintiffs and the Class Members into purchase order agreements, explicitly limiting the parties' relationship as non-personal service contractors or independent contractors. Contrary to the purchase order agreements' terms, Plaintiffs and the Class Members provided the Agencies personal services, as defined in 48 CFR § 37.104 and applicable FLSA provisions, creating an employee-employer relationship between the parties and entitling Plaintiffs and the Class Members to minimum wage, overtime, employer matching FICA tax contributions, and other benefits available to federal employees.

2.      Allegations that are consistent for all of the Named Plaintiffs and all similarly situated putative employees include:

•      They all worked in excess of 40 hours and were not paid overtime.

•      They all worked hours and days for which they were not paid at all, meaning they were deprived of minimum wage pay.

•      None of the respective federal government agencies they worked for matched Social Security or Medicare contributions.

•      They all took rest breaks for shorter than 20 minutes for which their respective federal government agencies never paid them.

•      All of the Defendant agencies went to meaningful pains to contrive schemes meant to sidestep the requirements of the FLSA, including calling working hours "deliverables;" failing to publicly compete the contracts; and contracting with staffing companies, but maintaining strict control over hours, days off, work requirements, equipment used, and virtually every other aspect of the traditional employer-employee relationship.

3.      At all times during the allegations in this Complaint, USAGM was engaged in the commercial enterprise of international news broadcasting. Appx226. USAGM's contract

with Messrs. Jordan and Greene  and all of the USAGM potential opt-ins, artificially limited their "deliverables" (a.k.a. compensable hours) to $3,000 per month, or the micro-purchase threshold under the FAR. Appx240; Appx339

4.      On information and belief, this facially illegal clause was included in the contract to keep USAGM's obligation below the reporting requirements. Appx339; *see also* 48 CFR 13.003(c)(2)(ii).

5.      Mr.  Jordan worked for USAGM from 2004 through the present. *Declarations and Opt-ins* at 7. At all times that he worked at USAGM, Mr. Jordan reported directly to a government employee. He had little to no control over his schedule. He was unable to benefit from efficiencies, because he was unable to send other technicians in his place. BBG paid him purely by the hour and forced him to reduce his hours through contract clauses that limited his reporting to $3,000 per month, or the FAR micro-purchase threshold.

6.      Mr.  Greene worked for USAGM from 2006 through the present. *Declarations and Opt-ins* at 11. At all times that he worked at USAGM, Mr. Greene reported directly to a government employee. He had little to no control over his schedule. He was unable to benefit from efficiencies, because he was unable to send other technicians in his place. BBG paid him purely by the hour and forced him to reduce his hours through contract clauses that limited his reporting to $3,000 per month, or the FAR micro-purchase threshold.

7.      Messrs. Jordan and Greene and those similarly situated individuals frequently worked in excess of 40 hours and BBG never paid them overtime pay.

8.      Messrs. Jordan and Greene and those similarly situated individuals frequently worked in excess of eight-hour days and USAGM never paid them overtime pay.

9.      Messrs. Jordan and Greene and those similarly situated individuals frequently worked hours and days for which USAGM did not pay them at all.

10.     USAGM required Messrs. Jordan and Greene and those similarly situated individuals to be on call 24 hours a day, seven days a week, including government holidays. Appx358. Messrs. Jordan and Greene and those similarly situated individuals were not allowed to bill the government for those "on call," hours, in contravention to the FLSA.

11.     USAGM never withheld or matched any Social Security or Medicare taxes as required by the IRS code. The IRS determined in 2010 that USAGM's POV contractors, like Messrs. Jordan and Greene and those similarly situated individuals, qualified as employees for the purpose of the code.

12.     The Inspector General of the Department of State's ("OIG") investigation into USAGM's procurement practices showed that USAGM was requiring work of technicians and other contractors that it was not paying for, in contravention of the Anti-Deficiency Act.

13.     USAGM refused to report these violations to Congress as required by the Act.

14.     USAGM's failure to pay for work that Messrs. Jordan and Greene and other similarly situated putative employees performed violated FLSA's minimum wage and overtime requirements.

15.     OIG's investigation also demonstrated that USAGM failed to compete the contract requirements on FedBizOps (FBO) as required by the FAR.

16.     While USAGM assured the OIG of its intent to change procurement processes, it never did.

17.     USAGM assured the OIG of its intent to change and remediate its employment practices and either contract with a staffing agency or seek additional authorizations for Personal Service Contracts (PSCs). USAGM never did the former. It moved some of its independent contractors to PSCs in the summer of 2020.

18.     USAGM admitted that it investigated the possibility of contracting with

4

staffing agencies or seeking authorization to hire more employees for the purpose of fulfilling its personal service requirements but decided against either move because it would cost the agency 30 percent more money.

19.      Therefore, USAGM knowingly ignored the guidance from its own OIG to change its procurement and employment practices in the name of saving money.

20.      USAGM also included a clause in its contract with Messrs. Jordan and Greene and other similarly situated putative employees forbidding them from "misrepresenting their status as independent contractors." Appx346, ¶(f) This clause created serious risk of liability for breach of contract, termination for default, and the threat of the government pursuing them for excess procurement costs for Messrs. Jordan and Greene and all similarly situated USAGM putative employees.

21.      All of the Agencies' misclassification practices of its putative employees as independent contractors created potential "anti-collusion" liability for all of the Named Plaintiffs and all similarly situated putative employees regardless of which agency they worked for.

22.      Whereas properly classified employees can band together for purposes of seeking higher wages, Named Plaintiffs and those similarly situated individuals would be running afoul of anti-collusion laws just by asking another wrongfully classified independent contractor how much he or she was getting paid.

23.      USAGM also "fraudulently concealed" its misclassification conduct by refusing to report violations of the Anti-Deficiency Act for failure to pay for services to Congress. Appx211. Pursuant to the attached OIG report, the OIG was unable to verify the number of BBG service contracts, because BBG did not maintain a list of contracts. Appx270.

24.      USAGM also did not compete any of the requirements Messrs. Jordan and Greene and those similarly situated individuals performed on fedbizopps.gov as required by the

5

FAR. After OIG's investigation, USAGM represented that it would change its procurement

practices and publish the contract requirements on FBO. To Named Plaintiffs' knowledge,

USAGM competed one contract on FBO in 2014 but has not competed the contracts since.

25.    This failure to publish contract requirements on FBO and the other practices

described in the paragraphs above created a shroud of secrecy that amounts to "fraudulent

concealment" of the government's illegal misclassification practices.[1]

26.    This explains why although these practices have been going on for decades, they

have never been challenged on a meaningful scale. That and the fact that the government's

enforcement arm has taken the legal position that the FLSA did not apply to government

employees.

27.    After leaving USAGM, Mr. Jason Lambro then went to work as an independent

contractor at the State Department, VoA's parent agency.

28.    While contracted with Techniarts, a federal contractor, Mr. Lambro answered to

State Department employees who controlled his schedule, time off, vacation time, and professional

advancement.

29.    Immediately after the Court of Appeals for the Federal Circuit ("CAFC") remanded

his FLSA case, State Department supervisors began harassing Mr. Lambro about alleged abuses of

time off policies. The agency did not initially approach Techniarts about the perceived problems,

but instead made Mr. Lambro give an accounting of his time off in  preceding months.

30.    Mr. Lambro easily answered the State Department's allegations and showed that

nearly all of the Department's allegations were false.

31.    In April 2024, State Department officials terminated Mr. Lambro's credentials

---

[1] USAGM has entered into more than 5,000 similar POV contracts with "miscellaneous foreign awardees" since 2012. Link to USA Spending Contractor Data

and his contract, constructively firing him, without any notice or explanation why. On information and belief, Mr. Lambro alleges that this "constructive firing" was retaliation for the protected act of filing this case and prevailing at CAFC.

32.     Mr. Lambro and those similarly situated individuals frequently worked more than 40 hours and the State Department never paid them overtime pay.

33.     Mr. Lambro and those similarly situated individuals frequently worked more than eight-hour days and the State Department never paid them overtime pay.

34.     Mr. Lambro and those similarly situated individuals frequently worked hours and days for which the State Department did not pay them at all.

35.     At all times relevant to the allegations in this Complaint, the Social Security Administration, Office of Hearings and Appeals, was engaged in conducting hearings for Social Security claimants. All these hearings required verbatim court reporting as performed by Plaintiffs Suzette and Steve Justice and similarly situated individuals. 20 CFR 404.951 Appx16, 17, 19, 23, 31.

36.     SSA artificially lowered the hours the Justices and other similarly situated court reporters charged the government, by limiting pay to five dollars for canceled hearings. By the same act, SSA deprived the Justices and other similarly situated workers of minimum wage by not allowing them to charge for the actual time worked, but instead limiting them to pay on a "per hearing" basis.

37.     SSA required the Justices and those similarly situated individuals to show up to all hearings and bear the risk of whether the assigned hearings were cancelled. Neither the Justices, nor any of the other verbatim court reporters ("VCRs") at SSA OHA had any say as to whether the court held or canceled a hearing and very often a "canceled" hearing lasted much longer than five minutes.

38.     The Justices and those similarly situated individuals frequently worked more than 40 hours per week or eight hours per day without overtime compensation.

39.     The Justices and those similarly situated individuals frequently worked in excess of eight-hour days and the SSA  never paid them overtime pay.

40.     The Justices and those similarly situated individuals frequently worked hours and days for which the SSA did not pay them at all.

41.     The Justices and those similarly situated individuals were not paid for morning or afternoon breaks shorter than 20 minutes.

42.     SSA engaged in "scheme to avoid paying overtime," by contracting with several "staffing companies" and limiting pay for canceled hearings to five dollars. Neither the staffing companies nor the VHRs working for those staffing companies had any control over whether those hearings were canceled, and yet SSA's contract with the staffing companies only allowed for five dollars to be paid for those canceled hearings. Often those "canceled hearings" would last thirty minutes or more and the VHRs would record testimony, but the ALJs in those hearings would deem them canceled, because the Social Security claimant did not show up.

43.     At all times relevant to the allegations in this Complaint, the National Human Genome Research Institute (NHGRI) at the National Institute of Health (NHI), was engaged in conducting laboratory research as conducted by Plaintiff Burke. Appx1-14. NIH artificially limited Mr. Burke's hours to 312.5 hours. Appx13. This limitation amounted to a "scheme to avoid paying overtime."

44.     Like USAGM and the SSA, NIH controlled when and where Mr. Burke worked. NIH personnel directly supervised Mr. Burke and those similarly situated individuals.

45.     NIH also engaged in "fraudulent concealment" by failing to compete the requirements Mr. Burke was performing on FBO or sam.gov. NIH also artificially limited the hours

Mr. Burke and those like him could report by limiting his "deliverables" to $10,000.

46.    NIH's limitation of pay to $10,000 and calling his hours worked "deliverables" is also tantamount to a "scheme to avoid paying overtime" in contravention of the FLSA.

47.    A review of Mr. Burke's purchase order reveals that it limits him to 312.5 hours in a single month, with no allowance for overtime. Appx13. On information and belief, Mr. Burke avers that the amount of the contract was limited to $10,000 in an attempt to sidestep reporting requirements and competition requirements required under the FAR. This practice is prohibited under FAR Clause 13.003(c)(2)(ii)

48.    Mr. Burke and those similarly situated individuals were, like all government independent contractors, precluded from colluding with other contractors under threat of criminal penalties.

49.    Mr. Burke and those similarly situated individuals frequently worked in excess of 40 hours and BBG never paid them overtime pay.

50.    Mr. Burke and those similarly situated individuals frequently worked in excess of eight-hour days and NIH  never paid them overtime pay.

51.    Mr. Burke and those similarly situated individuals frequently worked hours and days for which NIH did not pay them at all.

52.    At all times relevant to the allegations in this Complaint, the USPS was delivering mail in rural areas using independent contractors like Ms. Ruberandinda to do inherently governmental functions of delivering U.S. mail to residents and businesses.  Appx139.

53.    Ms. Ruberandinda and those similarly situated individuals were, like all government independent contractors, precluded from colluding with other contractors under threat of criminal penalties.

54.    Ms. Ruberandinda and those similarly situated individuals frequently worked in

excess of 40 hours and USPS never paid them overtime pay.

55.      Ms. Ruberandinda and those similarly situated individuals frequently worked in excess of eight-hour days and USPS never paid them overtime pay.

56.      Ms. Ruberandinda and those similarly situated individuals frequently worked hours and days for which USPS did not pay them at all.

57.      The USPS engaged in a "scheme to avoid paying overtime," by limiting Ms. Ruberandinda, and other similarly situated contracted mail delivery personnel to "firm fixed price contracts," with no mechanism for reporting or collecting overtime. On information and belief, the USPS contracting officers knew in advance of executing the contracts with. Ms. Ruberandinda and other contracted mail carriers that the mail routes could not be completed in a forty-hour work week. They also knew that there was no way for the contractor to ascertain the full size and time-commitment of the route until after they signed the contract.

58.      USAGM's willful misclassification is exemplified in its response to the OIG June 2014 Audit of the Broadcasting Board of Governors Administration and Oversight of Acquisition Functions. In that audit, the OIG determined that the USAGM misclassified Class Members in knowing violation of the law. Appx209, fn. 17. Even after the OIG's findings, USAGM refused to rectify its wrongs and continued to use purchase orders and vendor agreements to obtain personal services via contract until July or August of 2020.

59.      Defendant's illegal and deliberate misclassification of Plaintiff and the Class Members prevented Plaintiff and the Class Members from receiving employee benefits, tenure, and additional compensation for overtime hours as allowed by the FLSA.

60.      Defendant's illegal misclassification also deprived Plaintiff and the Class Members of their rights of collective bargaining under the Federal Service Labor-Management Relations Statute. Moreover, any communications between independent contractors related to the prices they are

charging the government for their services would have amounted to collusion, which is strictly precluded by anti-trust laws and the Sherman Act (15 U.S.C. § 1).

61.    Defendant could have at all times relevant to this complaint competed the requirements of the individual contracts relevant to this complaint so that the employee of the awardees could collectively bargain and enjoy the benefits of the Services Contract Act (SCA).

62.    Even if this Court ignores the OIG's application of 48 CFR § 37.104 to determine an employer-employee relationship, such a relationship would exist under this Court's adoption of the "Economic Realities" test and those cases involving FLSA claims.

63.    As a result of Defendant's actions, Plaintiffs and the Collective Action Members are entitled to:

(1) unpaid wages for work performed for which they did not receive any compensation, (2) overtime work for which they did not receive any overtime premium pay as required by law, (3) liquidated damages under the FLSA, and (4) any other damages the Court determines are due and owing based on the benefit conferred by Plaintiff and the Collective Action Members on Defendant.

## **JURISDICTION AND VENUE**

64.    This Court has subject matter jurisdiction over this matter pursuant to 29 USC § 216(b), which authorizes actions by private parties to recover damages for a violation of the FLSA's wage and hour provisions. Section 29 USC § 216(b) further provides that suit under the FLSA "may be maintained against any employer … in any Federal or State court of competent jurisdiction."

65.    This Court has federal question jurisdiction over the action pursuant to 28 USC § 1331 as Plaintiff's claims arise under the FLSA.

66.    This Court also has jurisdiction pursuant to the U.S. Court of Appeals for Federal Claims ruling in *Abbey v. U.S.*, 745 F.3d 1363 (Fed. Cir. 2014) and the Tucker Act 28 U.S.C. § 1491.

## **PARTIES**

67.     Defendant is the United States of America and its various agencies as described herein.

68.     USAGM (VoA, BBG) is an independent governmental agency created to provide international broadcasting. USAGM is comprised of five media organizations, including the VoA. USAGM is federally mandated to support daily operations and provide transmission and distribution services and technical support for the media organizations under its umbrella. Each organization within USAGM has multiple departments, all with separate leadership and workforce.

69.     USAGM acts as a corporate enterprise, with a Chief Executive Officer overseeing USAGM's operations' day-to-day management.

70.     The mission of USAGM is to inform, engage, and connect people around the world in support of freedom and democracy. USAGM completes this mission by producing and disseminating news commentary to its viewers in the United States and throughout the world.

71.     The U.S. State Department is the parent agency of the USAGM. Its mission is well known to this Court. The State Department frequently uses audio and video technicians like Messrs. Jordan and Lambro for filming State Department events. Mr. Lambro's duties at the State Department were very similar to those he performed at the USAGM.

72.     Plaintiff Jordan currently resides in Maryland. He lived in Maryland the entire time he worked for USAGM. He started with USAGM in 2004 as an audio technician. Mr. Jordan's most recent contract from 2019 placed his rate of pay at $50 per hour. He was on call 24 hours a day, seven days per week. However, the contract prevented Mr. Jordan from invoicing Defendant for more than $3,000 per month or the cap on the micro purchase threshold. Mr. Jordan worked on average

50 plus hours per week but never received overtime compensation. He also did unpaid time on Zoom calls and responding to emails. Mr. Jordan reported directly to a USAGM employee, could not negotiate his pay, received no paid holidays, and was forced to pay self-employment taxes. Appx350.

73.    Plaintiff Greene currently resides in Virginia. He lived in Virginia the entire time he worked for USAGM. He started with USAGM in 2006 as an audio technician. Mr. Greene's contract prevented him from invoicing Defendant for more than $3,000 per month or the cap on the micro purchase threshold. Mr. Greene worked on average 50 plus hours per week but never received overtime compensation. He was on call 24 hours a day, seven days per week. He also did unpaid time on Zoom calls and responding to emails. Mr. Greene reported directly to a USAGM employee, could not negotiate his pay, received no paid holidays, and was forced to pay self-employment taxes. Appx350.

74.    NIH, according to its website, is a part of the U.S. Department of Health and Human Services, is the nation's medical research agency — making important discoveries that improve health and save lives. Mr. Burke performed as a biologist for the NIH, performing the essential governmental function of medical research, which is incorporated in the NIH's publicly facing mission statement.

75.    Mr. Burke resides in Virginia and works for the NIH as a biologist. His contract is for $32 per hour with no allowance for overtime. Mr. Burke has worked at times, seven days a week, 10 hours per day with no vacation, sick, or paid holidays. He works in an NIH laboratory and reports to an NIH W2 employee. He cannot send anyone else in as a substitute biologist and has never been able to negotiate a higher rate of pay. He pays self-employment tax, has never received a pay raise, lacks collective bargaining power, and cannot even discuss his pay with other contractors, as that constitutes collusion.

76.    USPS delivers mail to residences and companies consistent with its organic statute

39 U.S. Code § 101. Plaintiff Ruberandinda and those similarly situated individuals deliver mail for the USPS in rural areas, much like traditional USPS postal workers. USPS employees have at all times relevant to this suit, exercised control over Ms. Ruberandinda's and other similarly situated contractors' routes, delivery times, and method of delivery for U.S. mail.

77.    Ms. Ruberandinda resides in Texas. She responded to a government RFP and bid a mail delivery job with the USPS on a "firm fixed price" contract in rural Texas. She was never allowed to learn the size and geography of her route until she started performing, because the postmaster told her the information was protected by the Privacy Act. "Firm fixed price" means she had to bid the route with no information and then deliver the mail at that price regardless of the size of the route, number of pieces delivered, or number of houses and businesses served. When she started, she learned that the route was much too large for one person to deliver the mail in one day and that the contract amount was far too small to hire people to deliver the mail and still be able to pay them minimum wage in Texas. USPS holds all the bargaining power over the contract and continually threatens to terminate her for default, re-solicit the contract, and sue her for any difference it has to pay to get the mail delivered. She thus delivers the mail for far less than minimum wage.

78.    Defendant SSA OHA conducts ALJ hearings for Social Security disability claimants in more than 100 offices across the United States and its territories. ALJ Disposition Data. Each of these hearings requires attendance and verbatim recording from VCRs like the Justices and other similarly situated putative employees.

79.    Suzette and Steve Justice reside in Colorado. They work as VHRs in Colorado for the Social Security Hearing Office. SSA pays them on a per hearing basis. Both Justices directly contracted with SSA. SSA requires them to bid on hearings in a vacuum, without ever discussing bid pricing with other VHRs, because to do so is collusion and against the law. Once they are "awarded" a

14

hearing, SSA requires them to arrive at the hearing location ready to perform, without knowing whether the hearing will move forward. The result is an accumulation of unpaid time at work. If a hearing is canceled for any reason, the Justices receive a mere five dollars, regardless of how long they spent onsite waiting on a claimant, medical expert, or vocational expert that did not show up. They, of course, do not get paid days off, holidays, sick time, or vacation. Moreover, the Justices pay self-employment tax and cannot negotiate for a raise in pay with the SSA.

80.     Named Plaintiffs bring this action on behalf of themselves and other similarly situated employees under 29 USC § 216(b). Named Plaintiffs and the similarly situated employees are individuals who were, or are, misclassified by USAGM, State Department, NIH, SSA, and USPS as independent contractors.

81.     At all relevant times, the Named Plaintiffs and the similarly situated putative Class Members were or are "employees" of USAGM, State Department, NIH, SSA, and USPS as defined by the FSLA, 29 USC § 203(e)(1).

82.     At all relevant times, the Names Plaintiffs were or are "employees," because they met the "economic realities" test outlined by the Department of Labor and adopted by courts. *See, e.g., Goldberg v. Whitaker House Co-op., Inc.*, 366 U.S. 28, 81 S. Ct. 933, 6 L. Ed. 2d 100 (1961).

83.     At all relevant times, USAGM, State Department, NIH, SSA, and USPS, were "employers" as defined by FLSA, 29 U.S.C. §§ 203(d) & (x).

84.     The putative Class is or has been "engaged in commerce" as required by the FLSA, 29 USC §§ 206-207.

## **FACTUAL ALLEGATIONS**

**Plaintiffs Jordan and Greene's and Similarly Situated Putative Employees' 2004-2020 Contract with the USAGM**

85.     USAGM is an international multimedia broadcaster with service in more than 40 languages with the sole purpose of providing news, information, and cultural programming via internet, mobile and social media, radio, and television.

86.     In 2004, Plaintiff Jordan began working with the USAGM pursuant to a purchase order agreement as a Studio Technician within USAGM's Televisions Operation/TV Studio Service department.

87.     In 2006, Plaintiff Greene began working with the USAGM pursuant to a purchase order agreement as a Studio Technician within USAGM's Televisions Operation/TV Studio Service department.

88.     Plaintiffs Jordan and Greene's and all of the USAGM potential opt-ins' purchase order agreement with the VoA has been in force from at least 2004 to approximately July 2020 and with no substantive changes since Plaintiffs Jordan and Greene  began working for the USAGM.[2] Moreover, the purchase order agreement contained the following terms:

    •      Article V – Submission of Deliverables: Plaintiff "shall submit work materials at least one hour prior to when the material is intended for use. (For example, material to be used at the 7:00 am broadcast must be submitted to the [Contracting Officer Representative] COR by 6:00 am)." Appx339

    •      Article X – Subcontracting: "None of the work to be performed under this [purchase agreement] shall be subcontracted, and no obligation or duty arising out of the [purchase agreement] may be transferred or assigned" without the approval of the USAGM, Contracting Officer, and other higher-ups with the governmental organization. Appx341

    •      Article XII – Acceptance of Agreement: Plaintiff "agrees that no employer- employee relationship exists" between Defendant and Plaintiff. Appx342

89.     Plaintiffs Jordan and Greene's and all of the USAGM potential opt-ins' employment package included a Statement of Work outlining Plaintiff their duties and

---

[2] The only changes to the purchase agreement have been increases to Plaintiff's hourly rate

responsibilities as Technician's for USAGM. The Statements of Work mandated the following:

> • Plaintiffs "shall perform the following work at . . . Voice of America, Washington DC Headquarters Building . . . unless otherwise mutually agreed to by the Contracting Officer." Appx347

> • Plaintiffs "shall provide general studio operation service utilizing Government equipment on-site at the office of . . . [VoA's] facilities." Plaintiff's responsibilities as a studio technician "include the operation of studio audio equipment, video device playback equipment, and the ability to perform the duties associated with a Studio Technician I. Appx347

> • Plaintiffs are required to be available for assignments 24 hours per day, 7 days per week, 365 days per year. Appx358

90.     Plaintiffs Jordan and Greene's first purchase order agreement was initially for a year with an option allowing USAGM to extend the contract term for a year at a time. In Plaintiffs Jordan and Greene's case, their contract was renewed many times, in one-year increments. The substantive terms in Plaintiffs Jordan and Greene's original purchase order agreement did not change throughout these seventeen years.[3]

91.     The express terms in the purchase order agreement provide ostensible independence to Plaintiffs Jordan and Greene in determining the manner and means of work. However, in practice, USAGM significantly controlled the timing and management of Plaintiffs Jordan and Greene's work. For example, Plaintiff Jordan contracted with USAGM to work in its Televisions Operation/TV Studio Service department as a Studio Technician II. Nevertheless, USAGM supervisors required Plaintiff Jordan to work in the Audio-Mix and Language department to complete audio-mixing tasks not required under his purchase order agreement or the statement of work for a Studio Technician II.

92.     Additionally, USAGM supervisors told Plaintiffs Jordan and Lambro when to arrive at

---

[3] Plaintiff received nominal pay increases during his tenure at the USAGM.

work. Once at work, USAGM instructed him on what audio systems he would operate, including what commands he should input into the audio/visual systems. Plaintiffs Jordan and Lambro at all times were required to abide by the commands given, whether or not he agreed with those commands based upon his professional opinion.

93.    Furthermore, at the time Plaintiffs Jordan and Greene signed the original purchase order and at all times thereafter, USAGM told Plaintiffs Jordan and Lambro to follow the directions of the on-site supervisor and/or department manager.

94.    At all times, Plaintiffs Jordan and Greene worked next to full-time, GS employees who completed the same work as Plaintiffs Jordan and Greene such as imputing commands into the audio/visual systems during ongoing television programs. Furthermore, all of Plaintiffs Jordan and Greene's actions were completed to meet the mission of USAGM, 22 USC 1461, and the VoA, which provides:

> (1) VOA will serve as a consistently reliable and authoritative source of news. VOA news will be accurate, objective, and comprehensive. (2) VOA will represent America, not any single segment of American society, and will therefore present a balanced and comprehensive projection of significant American thought and institutions. (3) VOA will present the policies of the United States clearly and effectively, and will also present responsible discussions and opinion on these policies. (Public Law 94-350)

95.    It was not uncommon for USAGM to demand its non-personal service providers, like Plaintiffs Jordan and Greene, to engage in work not required under their contractual agreement. 'Non- personal service' providers or purchase order vendors who failed to acquiesce to their supervisor's demands, such as transition over to a new department, were retaliated against and eventually fired.

96.    Plaintiffs Jordan and Greene were consistently directed to complete these non-contracted for tasks, under the direction of USAGM's full-time managers or risk being constructively fired, under the guise of a "termination for default."

18

97.     USAGM, by forcing Plaintiffs Jordan and Greene and the similarly situated individuals to work and complete tasks not included under the terms of their explicit contracts, took benefits from Plaintiff and other contractors without properly compensating Plaintiffs Jordan and Greene and the potential Collective Action Members for their work.

98.     Furthermore, while working at USAGM, Plaintiffs Jordan and Greene were never required to provide any equipment to complete his tasks because USAGM provided all equipment needed.

99.     At all times, when Plaintiffs Jordan and Greene discussed the discrepancies between the services provided per his contract and the additional services requested by USAGM, Plaintiffs Jordan and Greene were directed to discuss those issues with a USAGM supervisor and not the contract officer or contract officer's representative.

100.    Plaintiff USAGM and those similarly situated individuals were also unable to choose their schedules or the shows they wanted to work for on any particular day. Plaintiffs Jordan and Greene and those similarly situated individuals were also unaware of their specific tasks on a given day.

101.    USAGM even determined what days and hours Plaintiffs Jordan and Greene and those similarly situated individuals worked. Plaintiffs Jordan and Greene and those similarly situated individuals were required to come into work and check a schedule board to obtain assignments. This board informed Plaintiffs Jordan and Greene and those similarly situated individuals which television shows they had to work that day and how long they had to work. USAGM also required Plaintiffs Jordan and Greene and those similarly situated individuals to always remain on-call if the agency needed them at the office.

102.    While employed with Jordan, Plaintiffs Jordan and Greene worked more than 40 hours per week. Yet, he did not receive an overtime premium or any benefits USAGM's full-time

employees typically received. At all times at USAGM, Plaintiffs Jordan and Greene performed

assignments for the benefit of the Defendant and per USAGM charter, including but not limited to,

engaging in work necessary to ensure the successful production and broadcasting of various USAGM

video and radio programs.

103.    Plaintiffs Jordan and Greene was also required to work in departments outside of the

department mentioned explicitly in his contract.

104.    Throughout Plaintiffs Jordan and Greene's relationship with Defendant and due to the

Defendant's misclassification, Plaintiffs Jordan and Greene and those similarly situated individuals

were unable to obtain the following benefits of full employment:

- paid sick leave

- paid vacation time

- shared responsibility for tax withholdings

- join a labor union

- tenure

- health and short-term disability insurance

- joint contributions to retirement plans

105.    Furthermore, Plaintiffs Jordan and Greene and all similarly situated USAGM

putative employees at all times, while employed by USAGM were treated as an

essentialemployees. Upon information and belief, they were required to work and be on call,

without pay, during previous government shutdowns.

**USAGM Willfully Misclassified Plaintiffs Jordan and Greene and the other potential Collective
Action Members**

106.    USAGM willfully misclassified Plaintiffs Jordan and Greene and those similarly

situated individuals as independent contractors to minimize costs and avoid violating its

congressional hiring authority. In further support of USAGM's willfulness, Plaintiffs Jordan and

Greene cite to the OIG's June 2014 Audit of USAGM. The OIG determined that USAGM entered

into contracts with people like Plaintiffs Jordan and Greene, labeled for non-personal service, to

avoid violations under the Federal Acquisitions Regulation "FAR." The OIG determined that the

aforementioned contracts were, in fact, for personal services, as defined in 48 CFR § 37.104(d),[4] and

created an employee-employer relationship.

107.    In response to the OIG's audit, USAGM admitted that the contracts issued were personal

services contracts creating an employee-employer relationship with the government as defined by 48

CFR § 37.104. This admission occurred in 2014.

108.    The OIG reviewed many of the agreements, similar to Plaintiffs Jordan and

Greene's, between USAGM and its contractors and determined that relationships of those contracts

were as follows:

- The contractors worked on site;

- All tools relevant to the contractors' work were provided by the government;

- All efforts by the contractors were completed to serve integral efforts of
USAGM's missions;

- Contractors' efforts and services were identical or similar to USAGM's
full-time employees;

---

[4] 48 C.F.R. § 37.104(d) mimics in some way the Economic Realities test used by courts in private employment transactions and identifies six factors for assessing whether a contractor is providing personal service:
1.      Performance on site;
2.      Principal tools and equipment furnished by the government;
3.      Services that are applied directly to the integral effort of agencies . . . in furtherance of assigned function or mission
4.      Services that are comparable to or that meet needs comparable to those performed in the same or similar agencies using civil service personnel
5.      A reasonable expected need for the type of service in excess of one year; and
6.      An inherent nature of the service, or the manner in which it is provided, that reasonably requires direct or indirect government direction or supervision of contractors in order to: adequately protect the Government's interest. . . .

- Contractors' services were needed for an extended period of time; and

- Government employees supervised contractors' work.

109.    Within the same report, the OIG found that USAGM personnel could not understand the difference between personal or non-personal services contractors and full-time employees, because USAGM personnel were not taught the difference between the various personnel types.

110.    Yet, in the face of this investigation, Defendant continued to hire Plaintiffs Jordan and Greene and those similarly situated individuals as purchase order vendors or non-personal service contractors when advised that such a decision was improper.

111.    Even after this admission, USAGM failed to properly convert Plaintiffs Jordan and Greene's and those similarly situated individuals' contracts into personal service contracts and award them FLSA benefits.

**Allegations Relevant to Each Named Plaintiff and All Similarly Situated Putative Employees and The Economic Realities Test**

112.    **Plaintiffs Jordan and Greene and other Similarly Situated USAGM  Putative Employees**, for Test 1: was paid by the hour, required to work specific hours, and was not allowed to substitute himself with another without advanced, express consent of the USAGM. For test 2: he made no investment in the company other than his time, and this weighs in favor of him being an employee rather than an entrepreneur. Test 3: He worked every day for USAGM for two decades. Test 4: He reported directly to a USAGM government employee. Test 5: He was an audio tech in a TV station. Test 6: His position was/is skilled but requires no certification.

113.    **Plaintiff John Burke and other Similarly Situated NIH Putative Employees** were the same as Messrs. Jordan and Greene. Test 1: Mr. Burke was required to work in the lab under the supervision of a government scientist, and he could not send a substitute to perform his job, and he

was paid a specific hourly rate. Test 2: Mr. Burke provided investment into the company other than time. Test 3: Mr. Burke worked there every day at NIH for years. Test 4: He reported directly to a federal employee. Test 5. Mr. Burke worked as a biologist at the NIH. Test 6. Mr. Burke's position required a college degree required, but no certifications.

114.    **Plaintiff Marie-Pascale Ruberandinda and other Similarly Situated USPS Putative Employees** are slightly different, but also sinister. Test 1. Ms. Ruberandinda and those like her were doomed to lose money in their positions from the initial contract award. The contracts Ms. Ruberandinda and those similarly situated her signed lacked a meaningful definition for the scope of work. USPS denied Ms. Ruberandinda and those similarly situated individuals her the ability to inspect their routes before signing the award contract, and they only learned after contract execution, via performance, of the extreme extent of time necessary to complete delivery of the mail. Most of those performing these USPS contracts lost money. Test 2: Many of the individuals performing the USPS contracts had to purchase vehicles and other equipment to deliver the mail. Test 3: Ms. Ruberandinda and those similarly situated to her signed original contracts which were for daily mail delivery for one year. Test 4: Ms. Ruberandinda and those similarly situated to her reported directly to the Postmaster General at the post office. Test 5: Ms. Ruberandinda and those similarly situated to her delivered mail for the USPS. Test 6: Ms. Ruberandinda and those similarly situated to her were not highly skilled.

115.    USPS included clauses in the contracts Ms. Ruberandinda and those similarly situated to her signed which expressly require them to report to the post office at a particular time to "box." Appx170. The contract also included an estimated number of hours anticipated to complete mail delivery but required Ms. Ruberandinda and those similarly situated to her to determine the actual number of hours required, before submitting a proposal. Appx170. There was no way for Ms. Ruberandinda and those similarly situated to her to determine the actual number of hours required,

before getting the route specifics and the Postmaster at each facility knew that.

116.    **Suzette and Steve Justice and other Similarly Situated SSA Putative**

**Employees**. Test 1. The Justices and similarly situated VHRs could not profit from efficiency or

scale. SSA required the Justices and similarly situated VHRs to appear in person, and they were

paid per hearing, regardless of length. Justices and similarly situated VHRs had no control over

whether the hearing went forward or how long the hearing might take. Test 2: Justices and similarly

situated VCRs only investment was time. Test 3: Justices and similarly situated VHRs worked for

SSA daily for many years. Test 4: Justices and similarly situated VHRs answered directly to ALJs

at the SSA hearing office every day. Test 5: They conducted verbatim court reporting for hearings

in a SSA hearings office. SSA is statutorily required to provide these recordings for the claimant as

part of the hearing process. Failure to do so triggers an automatic remand. Test 6: The position

requires semi-skilled work with no credentialing required.

<u>**COLLECTIVE ACTION ALLEGATIONS**</u>

117.    Plaintiff reasserts and re-alleges the allegations set forth above.

118.    Plaintiff files this Complaint on behalf of himself and the potential members of the

Collective Action.

119.    The Collective Action consists of all persons who U.S. Government agencies classified

as independent contractors but were employees pursuant to the FLSA's "suffer to work" definition

under the "economic realities test" and whom the government did not pay overtime and minimum

wage pay as required by the Fair Labor Standards Act.

120.    The Collective Action also consists of individuals who were technically employed or

who contracted with other "staffing agencies," but who's time, hours, advancement, place and means

of job performance were directed by U.S. government "appointed" personnel.

121.    The Collective Action is limited to individuals who could obtain redress under the

applicable two-year statute of limitations for an ordinary violation of the FLSA and a three-year statute of limitations for a willful violation of the FLSA, or for whom the court grants equitable tolling in response to the motion attached herewith.

122.    Presently, the exact number of those eligible for certification under the Collective Action is not known but can be determined through discovery proceedings. The number of individuals in the potential Collective Action is believed to be greater than 100 individuals. This value is based on the number of individuals who have provided personal services as independent contractors to agencies of the federal government for the three years preceding January 28, 2021.

123.    Given the number of potential Collective Action members, joinder of each individual is impractical.

124.    This Complaint involves common questions of law and fact, including:

• Whether Plaintiff and the potential Collective Action members provided USAGM personal services as provided under 48 CFR 37.104, thus creating an employer-employee relationship;

• Alternatively, whether Plaintiffs and the potential Collective Action members were employees of the respective federal agencies with which they were contracted pursuant to the Economic Realities test;

• Whether Defendant misclassified Plaintiffs and the potential Collective Action members as independent contractors and whether Defendants' misclassification was willful or intentional; and

• Whether Plaintiff and the potential Collective Action members are entitled to unpaid overtime, minimum wage compensation, and matching Social Security and Medicare (FICA) taxes and liquidated damages under the FLSA.

• Whether Plaintiff and the potential Collective Action members contracts were void or valid.

• Whether Defendant breached its agreements to Plaintiff and potential Collective Action members.

125.    The named Plaintiffs will adequately and fairly protect the interest of the potential Collective Action members.

126.    Counsel from the undersigned firm will represent the Named Plaintiffs and the potential Collective Action members. The firm has successfully litigated complex actions and will adequately represent the named plaintiffs and the potential Collective Action members.

127.    Defendant's actions, through the USAGM, USPS, SSA, NIH, and State Department, have affected the entire group of potential Collective Action members, making global relief for the potential Collective Action members appropriate. Common questions of law and fact predominate over individual questions.

128.    USAGM, USPS, SSA, NIH, and State Department, have misclassified hundreds, if not thousands of putative employees. Appx190.

129.    USAGM, USPS, SSA, NIH, and State Department have also unilaterally controlled the work conditions of thousands of people technically employed by staffing agencies, but whose hours worked, place of performance, equipment used, and ability to advance were completely controlled by the respective U.S. government agency. Appx14-20.

## CLAIMS FOR RELIEF
### Count I
### (Violation of the FLSA's Misclassification Provisions)

130.    Plaintiff reasserts and re-alleges the allegations set forth above.

131.    At all times material herein, named Plaintiffs and the putative Class Members have been entitled to the rights, protections, and benefits provided under the FLSA, 29 USC §§ 201,

et seq.

132.    The FLSA regulates, among other things, the payment of overtime by employers whose employees are engaged in interstate commerce, or engaged in the production of goods for commerce, or employed in an enterprise engaged in commerce or in the production of goods for commerce. *See* 29 USC § 207(a)(1).

133.    Defendant violated the FLSA by misclassifying employees as independent contractors, specifically Plaintiffs and other similarly situated individuals.

134.    Defendant violated the FLSA by depriving all the named Plaintiffs and similarly situated putative employees of overtime for time they worked in excess of 40 hours per week and eight hours per day.

135.    Defendant violated the FLSA by depriving all the named Plaintiffs and similarly situated putative employees of minimum wage for time they worked and were not paid at all.

136.    Defendant violated the FLSA by depriving all the named Plaintiffs and similarly situated putative employees of overtime for time they worked in excess of 40 hours per week and eight hours per day.

137.    Defendant violated the FLSA by depriving all the named Plaintiffs and similarly situated putative employees of payment for short breaks under 20 minutes.

138.    Defendant's violation of the FLSA and misclassification of Plaintiffs and similarly situated putative employees harmed the collective Plaintiffs, because they each had to pay self-employment tax to the IRS rather than having their employers match Social Security and Medicare.

139.    It is well established that a worker agreeing to act as an independent contractor is insufficient to avoid the employee-employer analysis under the FLSA. *See Corp. Exp. Delivery Sys. v. NLRB*, 292 F.3d 777 (D.C. Cir. 2002) (affirming the decision that although workers were described in their contract as independent contractors, they were treated as employees).

27

Simply stated, contractual terms alone do not transmute the nature of an employment contract into one that is favorable to the employer under the FLSA.

140.    In determining the existence of an employee-employer relationship, the Wage and Hour Division of the Department of Labor, derived from Supreme Court precedent, codified the Economic Realities test. The Economic Realities test factors are:

   (1)    The nature and degree of the potential employer's control

   (2)    The permanency of the worker's relationship with the potential employer

   (3)    The amount of the worker's investment in facilities, equipment, or helpers

   (4)    The amount of skill, initiative, judgment, or foresight required for the worker's services

   (5)    The worker's opportunities for profit or loss

   (6)    The extent of integration of the worker's service into potential employer's business.

141.    The Economic Realities test used by the Wage and Hour Division of the Department of Labor was further echoed in *Escamilla v. Nuyen et al.*, 227 F. Supp.3d 37 (DDC 2017). In *Escamilla,* the Court also stated that none of the factors are dispositive, and the Court should look at the totality of the circumstances and evidence. *Id.* (citing *Morrison v. Int'l Programs Consortium, Inc.*, 253 F.3d 5, 10 (D.C. Cir. 2001)).

142.    Based on the facts provided, Named Plaintiffs and those similarly situated individuals were employees instead of independent contractors.

143.    Defendant exercised significant control over Named Plaintiffs and those similarly situated individuals in that Defendant's Agencies created and directed Plaintiffs and the Class Members schedules.

144.    In the case of Plaintiffs Jordan and Greene and other BBG contractors, Defendant required Plaintiff and similarly situated putative USAGM employees to be on-call at all times. Moreover, Plaintiffs Jordan and Greene and the similarly situated putative USAGM employees were not able to control what shows they worked on and when they worked. In Plaintiff's case, USAGM

required Plaintiff to complete tasks that were not required under his contract. Plaintiff was commanded by USAGM employees on how and which inputs to use while operating the audio/visual systems to which Plaintiff was required to comply with, even against Plaintiff's professional judgment. Furthermore, USAGM provided all of the equipment Plaintiff and the Class Members needed to complete their jobs.

145.    Defendant also prevented Named Plaintiffs and those similarly situated individuals from profiting from their investments in their respective businesses. Plaintiffs were constructively unable to hire employees to fill in for his duties because of the onerous procedure for subcontractor approval. *Compare with FedEx Home Delivery v. NLRB,* 563 F.3d 492, 499 (D.C. Cir. 2009) (Court determined that workers were independent contractors because workers could hire another individual to work in their stead and did not have to tell FedEx, among other reasons).

146.    Defendants' relationship with the Named Plaintiffs and those similarly situated individuals was permanent in nature. Named Plaintiffs and those similarly situated individuals signed purchase order agreements that gave Defendants a one- year renewal option, and Defendants regularly exercised those options. In Plaintiffs Jordan and Greene's case, USAGM renewed their purchase order agreement for decades, with no significant substantive changes to Plaintiffs Jordan and Greene's contractual obligations.

147.    Finally, Named Plaintiffs' and those similarly situated individuals' work was integral to the operation of Defendant's Agencies. This fact is exemplified by the sheer number of purchase order agreements Defendant's Agencies entered into and the limited number of full-time employees on staff. Further, without Named Plaintiffs and those similarly situated individuals, the Defendant's staff counts would be significantly reduced.

148.    Furthermore, given Defendant's misclassification of Named Plaintiffs, neither Named Plaintiffs and those similarly situated individuals were allowed to unionize or seek collective

bargaining, pursuant to Title VII of the Civil Service Reform Act of 1978 (also known as the Federal Service Labor-Management Relations Statute). On information and belief, Defendant's awareness of Named Plaintiffs' and those similarly situated individuals' inability to unionize or work together as a unit, less they risk allegations of collusion, led Defendant to take advantage of Named Plaintiffs' and those similarly situated individuals' inability to contest their treatment as a unit.

149.    Based on the foregoing, Named Plaintiffs and those similarly situated individuals were employees of the Defendant's agencies and organizations and are entitled to overtime pay, unpaid hourly wages, matching Social Security and Medicare tax payments (or ½ of the self-employment tax they were forced to pay); paid time off for breaks shorter than 20 minutes, liquidated damages, any other relief provided by the FLSA, and any other relief the Court deems reasonable.

**Count II**
**(Willful violation of the FLSA's Misclassification Provisions)**

150.    Named Plaintiffs and those similarly situated individuals reassert and re- alleges the allegations set forth above.

151.    A "willful violation" of the FLSA will expand the statute of limitations from two years to three years. *Escamilla*, 227 F. Supp. 3d at 52.

152.    A willful violation is one where "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *Id.* Named Plaintiffs have sufficiently alleged a willful violation in this case.

153.    Defendant was always aware, that the purchase order agreementsit entered into with Named Plaintiffs and those similarly situated individuals created an employee- employer relationship as evidenced by the pains the Defendant's Agencies went to orchestrating a scheme to sidestep the requirements of the FLSA. Yet, none of the Defendant Agencies did anything to convert Named Plaintiffs' and those similarly situated individuals' independent contracting status to full-time

employment. Nor did Defendant provide Named Plaintiffs and those similarly situated individuals with the benefits required under the FLSA.

154.    USAGM, in particular, was aware of its violation of several federal employment statutes and its refusal to rectify its failings for six years is a testament to its apparent disregard for the FLSA.

155.    Defendant Agencies are charged with knowing the requirements of the FLSA and complying with the FLSA minimum wage and overtime requirements.

156.    Based on the foregoing, Named Plaintiffs and those similarly situated individuals are entitled to overtime pay, liquidated damages, and any other relief provided by the FLSA for the past three years.

### Count III
### (Declaratory Judgment)

157.    Named Plaintiffs reassert and re-alleges the allegations set forth above.

158.    Declaratory judgment jurisdiction requires a definite and concrete dispute, touching the legal relation of the parties having adverse legal interests.

159.    Here, Named Plaintiffs and those similarly situated individuals seek a declaration that at all times while working for Defendant they were improperly misclassified and should have been classified as employees instead of independent contractors, pursuant to the FLSA.

160.    Defendant violated the FLSA by misclassifying employees, specifically Named Plaintiffs and other similarly situated individuals.

161.    It is well established that a worker agreeing to act as an independent contractor is insufficient to avoid the employee-employer analysis under the FLSA. *See Corp. Exp. Delivery Sys. V. NLRB*, 292 F.3d 777 (D.C. Cir. 2002) (affirming the decision that although workers were described in their contract as independent contractors, they were treated as employees). Simply stated, contractual terms alone do not transmute the nature of an employment contract into one that is favorable to the employer under the FLSA.

162.    Pursuant to the Economic Realities Test, Named Plaintiffs and those similarly situated individuals were  employees under the FLSA.

163.    Based on the foregoing Named Plaintiffs and those similarly situated individuals are entitled to a declaratory judgment that, irrespective of their contracts, they were employees under the FLSA.

## Count IV(Retaliation)

164.    Defendant, through its agency, the U.S. State Department, retaliated against Plaintiff Lambro for engaging in the protected act of pursuing his rights under the FLSA.

165.    As discussed above, within weeks of CAFC finding that the federal government was potentially liable under the "economic realities test" and that appointment to federal service was not required, started pressuring Mr. Lambro about the amount of time we had requested off for bereavement leave following his father's death.

166.    Less than 90 days after CAFC issued its opinion, State Department personnel unilaterally terminated Mr. Lambro's contract, which amounted to a constructive firing, an adverse employment action.

167.    On information and belief, State Department personnel constructively fired Mr. Lambro in retaliation for his protected action of pursuing his rights to overtime pay, under the FLSA, and succeeding on his appeal.

168.    Mr. Lambro suffered damages by way of lost wages, humiliation, and reputation costs.

169.    On June 13, 2024, *Lambro v. US,* COFC case 21-cv-01447, was returned to the trial court. Within days of that event, Defendant through its agency USAGM, terminated, or constructively fired 50 of its misclassified contractors.

170.    On information and belief, USAGM personnel constructively fired those 50 misclassified contractors in retaliation for their protected action of pursuing his rights to overtime pay,

under the FLSA.

## Count V

### (Fraudulent Concealment)

171.    Defendant, through its agencies, engaged in fraudulent concealment of the Named Plaintiffs and the potential opt-ins FLSA rights, by contractually precluding Plaintiffs from communicating that they were anything but contractors.

172.    Defendant, through its agencies, engaged in fraudulent concealment of the Named Plaintiffs and the potential opt-ins FLSA rights, by creating a scheme by which Plaintiffs and potential opt-ins risked terminations for default and incurring excess procurement costs if they told anyone they were employees of the federal government.

173.    Defendant, through its agencies, engaged in fraudulent concealment of the Named Plaintiffs and the potential opt-ins FLSA rights, by failing to compete the contracts the Plaintiffs and opt-ins were bound by, publicly as required by the FAR.

174.    Defendant, through its agencies, engaged in fraudulent concealment of the Named Plaintiffs and the potential opt-ins FLSA rights, by hiding the identity of thousands of USAGM awardees under the moniker "miscellaneous foreign awardees," on the government's public website.

175.    Defendant, through its agencies, engaged in fraudulent concealment of the Named Plaintiffs and the potential opt-ins FLSA rights, by persuading the State Department OIG that a contract cannot confer employee status absent an appointment to federal service. Appx290.

176.    Defendant, through its agencies, engaged in fraudulent concealment of the Named Plaintiffs and the potential opt-ins FLSA rights, by its legal arm, the Department of Justice, taking the legal position that the government could not be liable under the FLSA under the "economic realities test," because appointment was required to be a federal employee. [5]

---

[5] Plaintiffs address this issue in more detail in the accompanying Memorandum of Law in Support of Equitable Tolling

177.    Defendant, through its agency USAGM, engaged in fraudulent concealment of the Named Plaintiffs and the potential opt-ins FLSA rights, by constructively firing at least 50 misclassified putative employees a few days after Lambro v. USA returned to the trial court.

178.    All of the Named Plaintiffs and opt-ins pursued their rights for "overtime," in the past. Their "defective pleadings" include the *Lee* case from 2015; Mr. Burke's case at the CBCA; Ms. Ruberandinda and the Postal Appeal Board; and the SSA class action against Carmazzi.[6]

179.    All of the Named Plaintiffs and opt-ins pursued their rights again on June 18, 2024, through a Motion for Leave to Amend their complaint in *Lambro v. USA* COFC case 1:21-cv-255. There, the court had constructively denied the Plaintiff's Motion for Leave to Amend, but refusing to rule on that case, before Defendant responds to the Plaintiff's Second Amended Complaint, which the Plaintiff in that case filed in November 2021.

180.    Plaintiffs' and opt-in's rights were unknowable before June 13, 2024, after the Court of Appeals *Lambro* decision and the time the government delayed deciding whether to seek en banc review of that decision. Therefore, the Plaintiffs' and potential opt-ins' ignorance of their claims was not due to a lack of diligence on their part.[7]

### <u>REQUEST FOR RELIEF</u>

Named Plaintiffs respectfully request for themselves, and potential opt-ins, relief as follows:

A.    For an award of liquidated damages and prejudgment interest;

B.    For an award of damages including any difference in compensation Named Plaintiffs and the Class Members would have earned, but for the Defendant's illegal misclassification.

C.    For an award of reasonable attorneys' fees and costs incurred in prosecuting this action;

D.    For an order enjoining Defendants from continuing its unlawful pay practices;

---

[6] Again, all of these cases are discussed in more detail in the accompanying Memorandum of Law in Support of Equitable Tolling

[7] This issue is briefed in detail in the accompanying Memorandum of Law in Support of Equitable Tolling

E.      Leave to add additional Named Plaintiffs by motion, the filing of written consent forms, or any other method approved by the Court;

F.      Declaratory judgment that Named Plaintiffs and those similarly situated individuals were, at all times relevant to this complaint, employees under the FLSA.

G.      Enter judgment declaring that Defendant violated its statutory and legal obligations pursuant to the Fair Labor Standards Act, 29 U.S.C. § 201, et seq., and deprived Plaintiffs and all other FLSA Overtime Collective Action members of their rights, privileges, protections and compensation under the law, that the violations were not in good faith and that Defendant did not have reasonable grounds for believing that its acts complied with its obligations under the FLSA, and that the violations were willful;

H.      Certify that this case may be maintained as a collective action pursuant to 29 U.S.C. § 216(b) and that prompt notice of this action be issued to potential members of the Collective, apprising them of the pendency of this action, and permitting them to assert their FLSA claims;[8]

I.      Enter a judgment granting equitable tolling pursuant to the motion submitted herewith, for the named plaintiffs in this case and all putative collective members because their rights were unknowable before June 13, 2024, and because the government engaged in fraudulent concealment of the plaintiffs and potential collective member's rights under the FLSA.

J.      Award each member of the FLSA Collective the unpaid overtime and minimum wages they are owed and monetary damages in the form of liquidated damages;

K.      Leave to amend to add claims under applicable state laws; and

L.      For such further legal and equitable relief as the Court may deem just and proper.

        Dated: July 7, 2024                        Respectfully submitted,

                                                   By: /s/  Joseph A. Whitcomb

---

[8] This issue is brief independently in the accompanying Memorandum of Law in Support of National Certification

WHITCOMB, SELINSKY, PC.
2000 S. Colorado Blvd.
Tower 1, Suite #9500
Denver, CO 80222
303-534-1958 (telephone)
303-534-1949 (facsimile)
joe@whitcomblawpc.com

*Counsel for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 7th day of July 2024, the undersigned caused a true and correct copy of the attached Complaint**,** in the above-captioned matter, to be filed electronically with the Clerk of the Court. The Clerk of the Court accomplishes service on the United States pursuant to RCFC 4(a).

By:*/s/Joseph A. Whitcomb*

Joseph A. Whitcomb
Whitcomb, Selinsky, McAuliffe P.C
2000 S. Colorado Blvd.
Tower 1, Suite 9500
Denver, CO  80222
(720) 510-8322
(866) 476-4558 fax
joe@wsmlawpc.com